```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :      CRIMINAL ACTION
                              :
          v.                  :
                              :
HENRRY ANDINO                 :      NO. 15-83-4
```

MEMORANDUM

Bartle, J.                                         August 31, 2016

Before the court is the motion of defendant Henrry Andino ("Andino") "to suppress evidence obtained as the result of an unlawful search and seizure."  Andino is charged in the second superseding indictment with possession with intent to distribute 747.6 grams of a mixture and substance containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

I.

The court makes the following findings after an evidentiary hearing.

In January 2011, Special Agent Bruce Muhlberger ("Agent Muhlberger") of the Drug Enforcement Administration ("DEA") became involved in the investigation of a suspected large-scale cocaine trafficking operation being conducted by Jimmy Parrilla ("Parrilla"), Andino's co-defendant.  It was believed that Parrilla was running this operation from his residence at 4827 North Eighth Street in Philadelphia.  In 2011,

after a confidential informant purchased approximately 125 grams of powdered cocaine from Parrilla at his residence, agents installed a concealed pole camera to monitor his residence.  The camera remained in place through September 2013.

For sixty days beginning in July 2013, the DEA conducted a wiretap of Parrilla's phone.  During this wiretap investigation, Agent Muhlberger became familiar with the voices and identities of various individuals believed to be participants in Parrilla's drug trafficking operation.  Agent Muhlberger monitored numerous conversations between Parrilla and Guillermo Iglesias ("Iglesias") in which they used coded language, such as "Heineken," "Mickey," "Toyota," and "Camry," to refer to quantities of cocaine in conducting drug transactions.  Iglesias was one of Parrilla's primary cocaine suppliers.

During the course of the investigation, Agent Muhlberger became familiar with a pattern by which Parrilla and Iglesias sold cocaine to various customers.  It was customary that after Parrilla informed Iglesias that a customer was interested in purchasing cocaine, Iglesias would arrive at Parrilla's residence shortly before the customer did.  Iglesias would later depart moments before the customer did.

On August 16, 2013 at 4:50 P.M., Parilla told Iglesias that customers were interested in travelling from Erie[1] "for two." Iglesias expressed concern that it would take the customers six hours to drive from Erie to Philadelphia but Parrilla assured him that "[t]hey'll come and stay at the house of, of the uncle and- and they'll leave by, by morning." Iglesias responded "[t]ell them that, tell [ ] to jump to it and that in the morning it's for sure." During that conversation, Parrilla also stated "[d]on't let them take the, the Toyota and the Camry because they want to buy the two." Agent Muhlberger testified that "Toyota" and "Camry" were code words used to refer to quantities of cocaine. Approximately thirteen minutes later, at 5:03 P.M., Parrilla called Iglesias. Agent Muhlberger explained that during this call, Iglesias used coded language to relay that he had the cocaine and would hold it for the deal with the Erie customers.

Although DEA agents continued to listen to phone calls between Parrilla and Iglesias, no further references were made to the Erie customers until September 11, 2013. At 6:06 P.M. on that date, Parrilla received a phone call from an individual who was at the time unknown to the agents. After the caller identified himself as "Galdi," Parrilla asked him "what happened" and the caller responded "[u]h no, just to see if

---

1.  Erie is a city in the northwestern corner of Pennsylvania.

everything was fine." The caller indicated that he would "check in in a little bit or tomorrow."

Agent Muhlberger determined that the caller's phone number belonged to co-defendant Edgardo DeJesus ("DeJesus"), who resided two blocks away at 4957 North Seventh Street in Philadelphia.[2] Agent Muhlberger also learned that DeJesus had previously been associated with multiple addresses in Erie.

Three days later, on September 14, 2013, shortly after 9:00 A.M., a 1979 white Toyota Corolla pulled up to Parrilla's house and parked out front. Its license plate read JJZ1577 and was registered to DeJesus at 4957 North Seventh Street. DeJesus exited the vehicle and approached Parrilla's front door. After waiting there for a moment, DeJesus returned to his car. DeJesus then telephoned Parrilla and told him that he was outside his house. The pole camera captured Parrilla and DeJesus speaking outside of Parrilla's residence for several minutes. DeJesus then returned to his vehicle and pulled away.

Parrilla called Iglesias at 9:17 A.M. but he did not answer. Iglesias returned Parrilla's call approximately seven minutes later. Parrilla told Iglesias that "the guys are there already" and "[a]s soon as I- I put, put those things there for you, the, the papers . . . you have to go back really quick again to, to get two Heinekens because I didn't know the other

---

2. DeJesus also went by the name "Galdi."

two guys came with him too.  All right?"  When Iglesias said "[y]ou told me the two Heineken and the Micky," Parrilla responded "leave me the Micky till later until I do everything that's mine already . . . [y]es the Micky is mine, the Micky is mine."  Agent Muhlberger testified that "Heineken" and "Micky" were code words used to refer to quantities of cocaine.

Four minutes later, at 9:28 A.M., Iglesias called Parrilla to confirm that his customers sought "two boxes of Heineken."  At 9:34 A.M., Iglesias again confirmed that "the four Heineken cases are for sure?"  Parrilla responded "Yeah, bro, don't even ask me that again."

Agent Muhlberger determined that the Erie customers were in route to Parrilla's residence to purchase cocaine.  He arranged to have Task Force Officer Marilyn Brown ("Officer Brown") set up near DeJesus's Seventh Street home.  She observed two cars parked outside of DeJesus's residence:  the white 1979 Toyota Corolla that DeJesus had driven to Parrilla's house earlier that morning and a silver 1993 Toyota Corolla with license plates JHE1892 registered to an individual in Erie.

Around 10:00 A.M., Iglesias pulled up to Parrilla's house in a blue GMC Yukon and parked out front.  He phoned Parrilla to tell him that he had arrived and Parrilla told him the door was open.  Iglesias exited the vehicle and entered Parrilla's house through the front door.  A few minutes later,

-5-

Parrilla called DeJesus and asked him to "[c]ome, um, come out with him over here" and "[l]et's go, let's go, come over here." DeJesus responded that he had wanted Parrilla to come to where he was but that he would go to Parrilla's house instead. He also said "you wanna take the money with you."

At 10:11 A.M., when an unanswered call came into his phone, the wiretap picked up Parrilla stating "[n]ow, if I come back with this money." Around that same time, Officer Brown observed DeJesus exiting his house accompanied by a Hispanic male wearing a dark baseball cap, large sunglasses, and a dark warm-up jacket with white stripes down each sleeve. They entered the silver Toyota Corolla registered to the Erie address. Officer Brown followed them as they drove to Eighth Street, and the pole camera recorded them parking near Parrilla's residence. DeJesus and the man in the dark warm-up jacket entered Parrilla's house through the front door. The latter, it turned out, was Andino.

At approximately 10:22 A.M., Iglesias exited Parrilla's house, approached his GMC Yukon, and then returned to Parrilla's house. A few minutes later, Parrilla and Andino left Parrilla's residence, opened the trunk of the silver Toyota Corolla, removed yellow and brown shopping bags, and returned to Parrilla's house. They then entered through the front door. After spending a few more minutes inside, DeJesus and Andino

exited carrying the brown and yellow shopping bags, which appeared to contain a large cylindrical object of substantial weight.  They drove the silver Toyota Corolla to DeJesus's Seventh Street residence.  DeJesus exited the vehicle and returned to his house while Andino drove off.  Parrilla called DeJesus a few minutes later to confirm that he was home and to discuss paying Iglesias.  Parrilla said "[l]et's each give him a hundred.  You put, you give him 100 and I will give him 100 so he doesn't feel so bad. . . . We each give 100 to this bastard so he doesn't cry."

Officer Brown attempted to follow the Toyota Corolla after DeJesus was dropped off, but she lost it in traffic. Agent Muhlberger contacted the Pennsylvania State Police to request its assistance in locating and stopping the vehicle. Agent Muhlberger described the vehicle, the driver, and the driver's attire and provided the vehicle's license plate number. He also described the yellow and brown shopping bags which contained a heavy cylindrical object.  He told the State Police that he believed the car contained large quantities of cocaine and was likely returning to Erie.

At approximately 6:20 P.M., a State Trooper stopped the silver 1993 Toyota Corolla with license plates JHE1892 on Interstate 90 in Erie County.  The Trooper learned that the driver was defendant Henry Andino.  A State Police drug

-7-

detection dog handler used his trained K9 to conduct an exterior sniff of the vehicle. The State Police then transported the vehicle to the State Police Girard Barracks and obtained a search warrant from an Erie County Magisterial District Judge. The search warrant application did not mention the underlying DEA investigation.

In executing the search warrant, the State Police found 747.6 grams of cocaine in the trunk. Some of the cocaine was wrapped in a dark warm-up jacket with white stripes down the sleeves. The remainder of the cocaine was found inside of a large cylindrical coffee can. That coffee can was located inside of yellow and brown shopping bags. The top of the can was factory sealed, and the can had a false bottom. A second cylindrical container had been packed inside of the can using green bubble wrap. Coffee grounds were spread on top to conceal the second container. Andino's driver's license, keys, money, multiple cell phones, and several other cards were also recovered from the vehicle.

II.

The Fourth Amendment to the United States Constitution provides:

> [t]he right of the people to be secure in
> their persons, houses, papers, and effects,
> against unreasonable searches and seizures,
> shall not be violated, and no Warrants shall
> issue, but upon probable cause, supported by

> Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.  Although the Fourth Amendment generally requires the police to obtain a search warrant before conducting a search, the United States Supreme Court has recognized an exception to this requirement for vehicle searches.  The Court has held that "where there was probable cause to search a vehicle 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, <u>even though a warrant has not been actually obtained</u>.'"  See <u>Maryland v. Dyson</u>, 527 U.S. 465, 467 (1999) (quoting <u>United States v. Ross</u>, 456 U.S. 798, 809 (1982)).  Exigency is not necessary.  See <u>id.</u>

An automobile search is valid if there is probable cause to believe that the automobile contains evidence of a crime.  <u>See</u> <u>United States v. Donahue</u>, 764 F.3d 293, 300 (3d Cir. 2014).  "The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and prudent men.'"  <u>See</u> <u>id.</u> at 301 (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 230–31 (1983)).  "We evaluate 'the events which occurred leading up to the . . . search, and then . . . [decide] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause.'"  <u>See</u> <u>id.</u> (quoting <u>Ornelas v. United</u>

States, 517 U.S. 690, 696 (1996)).  There is probable cause if "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  See Gates, 462 U.S. at 238.  "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  Ross, 456 U.S. at 825.

### III.

Andino seeks suppression of evidence uncovered by the Pennsylvania State Police in searching the vehicle that he was driving when he was apprehended in Erie County on September 14, 2013 approximately eight hours after he and his car were involved in a drug transaction in Philadelphia.  Andino argues that any probable cause to search the car had become stale during the drive from Philadelphia to Erie County.[3]

The DEA knew that Parrilla had been conducting drug transactions from his Eighth Street residence.  During its investigation of Parrilla's drug trafficking operation, a confidential informant had purchased a substantial quantity of cocaine from Parrilla at that residence.  In addition to that information, the DEA's video, wiretap, and physical surveillance

---

3.  At the suppression hearing, Andino withdrew his motion to the extent it sought suppression of "all statements attributed to the defendant as taken by the Pennsylvania State Polcie, and any evidence derived therefrom."

of Andino, Parrilla, Iglesias, and DeJesus on the morning of September 14, 2013 provided "abundant probable cause" to stop and search Andino's Toyota Corolla for evidence of criminal activity.  See Dyson, 527 U.S. at 467.  DEA Agent Muhlberger told the State Police that a vehicle and driver transporting a large quantity of cocaine were likely headed to Erie.  He also described the vehicle, the driver, the driver's attire, and the yellow and brown shopping bags which contained a heavy cylindrical object.  Relying on that information, the State Police apprehended Andino in Erie County.  Pursuant to the collective knowledge doctrine, "the arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause."  See United States v. Burton, 288 F.3d 91, 99 (3d Cir. 2002).  It is sufficient that DEA agents had probable cause to search Andino's vehicle regardless of whether the State Police who apprehended Andino possessed the same first-hand knowledge of this information.

The existence of probable cause did not become stale during the approximately eight hours while Andino drove from Philadelphia to Erie County.  "The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the

warrant."  See United States v. Urban, 404 F.3d 754, 774 (3d Cir. 2005) (quoting United States v. Harvey, 2 F.3d 1318, 1322 (3d Cir. 1993)).  "Rather, we must also examine the nature of the crime and the type of evidence."  See id. (quoting Harvey, 2 F.3d at 1322).  For example, in Dyson, the Supreme Court upheld the warrantless search of a vehicle stopped fourteen hours after police had received a tip from a reliable confidential informant that the vehicle had been used to purchase drugs in another state.  See Dyson, 527 U.S. at 467.  This case is no different.  The drug purchase by the confidential informant as well as the video, wiretap, and physical surveillance established abundant probable cause to conduct a warrantless search of the silver Toyota Corolla for drugs.

     Accordingly, the motion of defendant Henrry Andino to suppress evidence will be denied.